IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DENINE R. HOOD, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 14-867 |
| vs. | ) | Judge David Stewart Cercone/ |
| | ) | Chief Magistrate Judge Maureen P. Kelly |
| | ) | |
| CITIZENS BANK OF | ) | |
| PENNSYLVANIA *a subsidiary or* | ) | Re: ECF No. 37 |
| *Division of Citizens Financial Group, Inc.*, | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

Plaintiff Denine R. Hood ("Plaintiff") initiated this civil action against Defendant

Citizen's Bank of Pennsylvania ("Defendant") alleging that Defendant discriminated against her

because of her age, gender and race when Defendant terminated her employment in January of

2013.

Presently before the Court is a Motion for Summary Judgment ("the Motion") submitted

on behalf of Defendant.  ECF No. 37.  For the reasons that follow, it is respectfully

recommended that the Motion be granted.

## II.    REPORT

### A.    FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts in this case are largely undisputed.  See ECF Nos. 40, 46, 55, 56.[1]

The record shows that Plaintiff is an African-American female who, at the time of the

events at issue in this case, was 60 years old.  ECF No. 19 ¶ 6; ECF No. 40 ¶ 17.  Plaintiff was

hired by Mellon Bank in 1973 and continued to work for Defendant when it acquired Mellon

---

[1] As such, unless otherwise specified, the Court has cited to the Concise Statement of Material Facts and the record references submitted by Defendant in support of the Motion as it appears to be more comprehensive than that submitted by Plaintiff.  ECF No. 46 at 11.

Bank in 2001.  Id. ¶ 18.  Since that time, Plaintiff worked as the Branch Manager at Defendant's Homestead Branch.  Id. ¶ 19

The record also shows that Defendant, as a financial institution operating retail banking establishments in the United States, is required to comply with aspects of the Currency and Financial Transactions Reporting Act of 1970, as amended by the Uniting and Strengthening America by Providing Appropriate Tools to Intercept and Obstruct Terrorism Act of 2001 ("the USA PATRIOT Act"), and that Section 326 of the USA PATRIOT Act requires all financial institutions, including Defendant, to establish and maintain procedures for verifying the identity of individuals seeking to open a bank account.  Id. ¶¶ 1, 2.  To that end, Defendant has established Anti-Money Laundering ("AML") Policies which includes a Customer Identification Program.  Id. ¶¶ 3, 4.

Defendant also requires its employees to review and concur with its Retail Colleague Commitment Guide which refers employees to policies in "CLIK2," an online database of policies that employees are expected to be familiar with.  Id. ¶¶ 8, 89.  CLIK2 Article ID 62632 is entitled "Required ID for In-Person Account Opening" and expressly provides that "All in-branch customers must provide an unexpired government-issued photo ID to open an account. The primary owner on the Account must be present."  Id. ¶ 10.  CLIK2 Article ID 63876 sets forth the acceptable forms of ID for opening an account and requires that "they **include a photograph** on an **unexpired federal and state government-issued ID**."  Id. ¶ 11 (emphasis in original).  The same policy also provides that "[t]he primary owner on the account must be present," and that "[t]here are no allowable exceptions to this policy."  Id. ¶¶ 11, 12, 89.

In addition, Defendant has established a policy against falsification of banking records, which is set forth in CLIK2 Article ID 79154, and provides that:

**Falsification** of any type, including bank documents, is not permitted and is strictly prohibited. There are different ways to falsify information and it is important to understand what some of them are. The following is a list of examples:

**Account Opening/ Maintenance**
o  Opening new accounts with fictitious ID or customer information.
o  Improper verification on personal or business signature cards or account opening documentation.
o  Opening an account when a customer is not present….

Id. ¶ 13.

Defendant also maintains a Code of Business Conduct and Ethics, which provides that:

Section 8.1 Other Employee Obligations – Records and Accounts

All bank records shall be maintained in accordance with the RBSCFG Accounting Policy and with other applicable accounting policies, procedures, and controls. All transactions shall be recorded timely, accurately, completely, and truthfully. Efforts by any employee to conceal or distort information will be considered unacceptable conduct. Embezzlement, misappropriation of funds or property, or the falsification of any record, account or document may result in immediate dismissal and will be referred to the appropriate law enforcement agencies….

Section 8.4 Other Employee Obligations – Anti-Money Laundering/ Office of Foreign Asset Control (OFAC) Compliance

Company employees must make reasonable efforts to determine the true identity of all customers to help keep the global financial and trading systems from being used as a channel for financing crime and terrorism. Business transactions will not be conducted with customers who fail to provide appropriate evidence of their identity, or who seek to deceive regulatory or law enforcement agencies by providing altered, incomplete or missing information….

Id. ¶ 14.

Further, it is undisputed that Plaintiff participated in Defendant's annual AML and Retail Colleague Commitment training, as required, in June of 2012 and January of 2012, respectively, and that she was familiar with the above policies.  Id. ¶¶ 5-7, 22-24, 89, 90.

On August 13, 2012, Plaintiff opened checking and savings accounts for a customer, Mr. S., whom she did not know and who provided Plaintiff with a driver's license that had expired on December 31, 2011, almost eight months earlier. Id. ¶¶ 43-46. Plaintiff nevertheless accepted the driver's license to open the accounts and entered December 31, 2015, as the expiration date on Mr. S.'s driver's license into TouchPoint, the computer program used by Defendant that generates accounts. Id. ¶¶ 45, 46. Plaintiff contends that, although she was aware at the time that the expiration date that she entered was not correct, she was exercising her "management discretion" which she had done on other occasions. On those occasions, Plaintiff testified that she usually asked the customer to bring in an unexpired license and would give them up to five days to do so before closing the account. Id. ¶¶ 47, 48; ECF No. 41 at 16. Mr. S. apparently returned to the bank the next day and withdrew the funds he had previously deposited using the same expired license as proof of his identity. ECF No. 40 ¶ 49.

Sometime thereafter, a colleague anonymously reported that Plaintiff had opened an account for Mr. S. with an expired driver's license and had altered the expiration date when entering the information into TouchPoint. Id. ¶¶ 50, 51. The incident was reported to Corporate Security Services ("CSS"), Defendant's investigations department, on September 18, 2012, and Justin Hanna ("Hanna"), an Investigator I, was assigned to investigate the matter. Id. ¶¶ 33, 52. During the course of his investigation, Hanna discovered that on another occasion, on or about August 23, 2012, Plaintiff had entered information into the computer indicating that a customer, Mr. B., was present in the bank when his account was opened but that the video surveillance recorded at the time contradicted that information. Id. ¶¶ 55, 56.

On November 29, 2012, Hanna and one of Defendant's Senior Investigators, Matthew Clydesdale ("Clydesdale"), interviewed Plaintiff at which time Plaintiff stated that she must have

misread Mr. S.'s ID and confirmed that Mr. B. was not present in the bank when his account was opened. Id. ¶¶ 58-62. Plaintiff provided a written statement following the interview in which she stated that she "misread the ID expiration date or [Mr. S.] had different ID," and that she "usually ask[s] customers to get new ID." Plaintiff also stated that she "was asked to have [Mr. B.'s] accounts ready when he came in. Listed customer as in branch rather than out of branch in error. Customer decided against opening accts. I may have forgotten to close it the same day it was opened." Id. ¶ 63.

After being contacted by Plaintiff, Hanna and Clydesdale met with Plaintiff again on December 6, 2012, at which time Plaintiff acknowledged that she altered the expiration date on Mr. S.'s driver's license when she entered it into the computer. Id. ¶¶ 64-65. Plaintiff then provided Hanna and Clydesdale with a second written statement in which she wrote that Mr. S.'s "landlord required an account to debit security deposit for a new apartment. During account opening, I noticed the expired id and asked [Mr. S.] if he had an updated id." Plaintiff further indicated that Mr. S. said he did not have a current ID, that she told him if he did not get the ID that the account would be closed, and that she was "using management discretion in putting the updated expiration date in at account opening before having the actual updated ID." Id. ¶¶ 66, 67.

On December 7, 2012, Hanna forwarded his completed Investigation Report, in which he found that Plaintiff had falsified bank records in violation of Defendant's policies, to the Employee Relations Service Center which assigned the case through an automatic queue to Dayna Walters ("Walters"). Id. ¶¶ 68, 70. Walters reviewed Hanna's Investigation Report and Plaintiff's two written statements and, on January 2, 2012, spoke with Michele Smichnick ("Smichnick"), Plaintiff's Regional Manager, and Market Administration Manager Pam Nagy

("Nagy"), to discuss CSS's investigation of Plaintiff's conduct. Id. ¶¶ 72-75. Walters, Nagy, and Smichnick met with Plaintiff on that same date at which time Plaintiff explained that she was trying to help Mr. S., who told her that he was trying to obtain an apartment and needed to open an account. Id. ¶¶ 76-77. Plaintiff stated that when she saw that Mr. S.'s identification was expired she told Mr. S. that if a current ID was not provided in a few days, the account would be closed. Plaintiff also stated that she was "comfortable" with the customer and believed that he would return with the ID, and thus used "management discretion" and opened the account. Id. ¶ 77. When asked why she initially told CSS that she had "misread" the ID, Plaintiff told Walters, Smichnick and Nagy that when she first spoke to CSS she did not remember the incident and had confused it with another occasion where she had misread the ID expiration date during an account opening. Plaintiff stated that she subsequently remembered opening Mr. S.'s account and that she knew the ID was not correct when she opened it. Id. ¶ 78. Plaintiff also told Walters, Smichnick and Nagy, however, that she did not know that she could not state that the customer was in branch when the customer was not present as she had done when opening Mr. B.'s account. Id. ¶ 79. When asked if she had any additional information to provide regarding the matter, Plaintiff admitted to Walters, Smichnick and Nagy that she "should not have done it," but that she did not open the accounts for incentive purposes. Id. ¶ 80.

Because falsification of account opening procedures or falsification of any bank documents is grounds for termination, Walters emailed Smichnick and Nagy on January 3, 2012, stating that she was going to write up a termination request. Id. ¶¶ 87-88. Walters then prepared an Investigative Summary outlining the allegations and findings relative to the investigation and her recommendation of termination for violation of the falsification policy, CLIK2 Article ID 79154, and failure to follow the required identification for in-person account opening policies,

CLIK2 Article IDs 62632 and 63876.  Id. ¶¶ 91, 92.  Walters sent her Investigative Summary and Plaintiff's written statements to Diane Sakowski ("Sakowski"), the Manager of Employee Relations, on January 7, 2013, with an explanation that she would like the case reviewed due to Plaintiff's hire date.  Id. ¶ 93.

After reviewing the Investigative Summary and Walter's recommendation, Sakowski concurred that terminating Plaintiff's employment was appropriate.  Id. ¶¶ 93-95.  However, because Plaintiff was a long term employee, Sakowski forwarded the Investigative Summary and recommendation prepared by Walters to Michael Pagano ("Pagano"), then Head of Employee Relations Policy, for his review.  Id. ¶¶ 96, 98.  Pagano reviewed the Investigative Summary and concurred with the recommendation to terminate Plaintiff's employment finding that the recommendation was consistent with Defendant's policy.  Id. ¶ 99.

On January 7, 2013, Walters informed Smichnick and Nagy that her final recommendation was to terminate Plaintiff's employment "for falsification and failure to follow account opening identification standards," and that the recommendation was supported by Pagano.  Id. ¶ 101.  Smichnick and Nagy concurred with the recommendation as well and, on January 14, 2013, Nagy and Smichnick met with Plaintiff and informed her that her employment was terminated.  Id. ¶¶ 102, 103.

It appears that on that same day, Ernest Leskovitz, a white forty-three year old male, who had never been a Branch Manager at a bank, became Branch Manager at the Homestead Branch. Id. ¶ 104.  See ECF No. 46 ¶¶ 162, 163.

Plaintiff filed a Complaint initiating this action on July 2, 2014, ECF No. 1, and filed an Amended Complaint ("the Amended Complaint") on December 2, 2014.  ECF No. 19.  In the Amended Complaint, which remains the operative complaint, Plaintiff has brought claims

against Defendant for age discrimination pursuant to the Age Discrimination in Employment Act, 29 U.S.C.A. § 621, *et seq.* ("ADEA") (Count I); gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Count II); race discrimination under Title VII (Count III); and claims for age, gender and race discrimination pursuant to the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 955, *et seq.* ("PHRA") (Counts IV, V and VI, respectively).

Defendant filed the instant Motion on September 18, 2015, ECF No. 37, to which Plaintiff filed a Brief in Opposition on October 16, 2015. ECF No. 45. Defendant filed a Reply Brief on October 30, 2016, ECF No. 52, and thus the Motion ripe for review.

### B.    STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that: "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). See Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007), *quoting* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. at 322. See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007), *quoting* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Matreale v. New Jersey Dep't of Military & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).

## C.    DISCUSSION

Where, as here, a plaintiff seeks to establish his or her claims under the ADEA and Title VII through circumstantial evidence, the three-stage shifting burdens of proof developed for employment discrimination cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies. Burton v. Teleflex, Inc., 707 F.3d 417, 425-26 (3d Cir. 2013); Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000). Under the McDonnell Douglas framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. Id. To establish a *prima facie* case of age discrimination under the ADEA, the plaintiff must demonstrate that: (1) she is forty years of age or older; (2) the defendant took an adverse employment action against her; (3) she was qualified for the position in question; and (4) she was ultimately replaced by another

employee who was sufficiently younger to support an inference of discriminatory animus.

Burton v. Teleflex, Inc., 707 F.3d at 426, *citing* Smith v. City of Allentown, 589 F.3d 684, 689

(3d Cir. 2009).  To make a showing of a *prima facie* case of gender or race discrimination under

Title VII, a plaintiff must show that: (1) she was a member of the protected class; (2) she was

qualified for the position; (3) she suffered an adverse employment action; and (4) those not in the

protected class were treated more favorably.  Id., *citing* Hugh v. Butler Cnty. Family YMCA,

418 F.3d 265, 267 (3d Cir. 2005).[2]  "Once the plaintiff satisfies these elements, the burden of

production shifts to the employer to identify a legitimate non-discriminatory reason for the

adverse employment action.  If the employer articulates such a reason, the burden of production

returns to the plaintiff to demonstrate that the employer's proffered rationale was a pretext for ...

discrimination."  Smith v. City of Allentown, 589 F.3d at 689-90; Scheidemantle v. Slippery

Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 538 (3d Cir. 2006).  At all times, however,

the burden of persuasion remains with the plaintiff.  Smith v. City of Allentown, 589 F.3d at 690.

Defendant in this case has not challenged Plaintiff's ability to establish a *prima facie* case

of age, gender or race discrimination for purposes of this Motion.  Nor does Plaintiff dispute that

Defendant's assertions that its decision to terminate Plaintiff's employment was based on

Plaintiff's violation of Defendant's policy requiring bank personnel to validate a customer's

identity when opening an account and that against entering false information into the bank

system satisfies Defendant's burden of articulating a legitimate non-discriminatory reason for its

employment decision.  Thus, the only question before the Court is whether Plaintiff has pointed

to evidence of record that would establish that Defendant's proffered reasons were pretext for

discrimination.  Smith v. City of Allentown, 589 F.3d at 690.

---

[2] The Court notes here that Plaintiff's claims brought under the PHRA are properly evaluated coextensively with her ADEA and Title VII claims.  Burton v. Teleflex, Inc., 707 F.3d at 432.

To meet this burden, a plaintiff must introduce evidence from which a fact finder could either: 1) disbelieve the employer's articulated legitimate reasons; or 2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) ("Fuentes"). With respect to claims of age discrimination, however, it is not sufficient to simply show that age was "a motivating factor;" rather, it is incumbent upon the plaintiff to demonstrate that age was a determinative factor or "the 'but-for' cause of the employer's adverse decision." Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176 (2009). See Smith v. City of Allentown, 589 F.3d at 691. See also Anderson v. Equitable Resources, Inc., 2009 WL 4730230 at *14 (W.D. Pa. Dec. 4, 2009) ("to show pretext at this stage [plaintiff] must proffer sufficient evidence for a reasonable jury to find that … the Defendant's proffered reasons would not have resulted in his termination absent improper consideration of age"). Under either scenario, however, it is not sufficient for a plaintiff to "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is . . . not whether the employer is wise, shrewd, prudent, or competent." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-1109 (3d Cir. 1997), quoting Fuentes, 32 F.3d at 765. Rather, the employee must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Id.

Here, Defendant argues that Plaintiff is unable to establish that its non-discriminatory reasons for terminating Plaintiff's employment were pretext for discrimination under any of these standards. With respect to Plaintiff's ability to show that Defendant's reasons are simply unworthy of belief, Defendant argues that there is no evidence that its reasons for discharging

Plaintiff were not the true reasons and points to the fact that Plaintiff admitted that her actions violated the policies at issue. Defendant further argues that Plaintiff's references to her length of service and her belief that she was permitted to exercise "management discretion" does not establish pretext.

Plaintiff does not directly address Defendant's arguments in this regard but, rather, merely refers to the "Introduction and Brief Statement of Facts" and "Response to Defendant's Statement of Facts" sections of her Responsive Brief and states that, coupled with her own Concise Statement of Material Facts, she has offered ample evidence to contradict Defendant's non-discriminatory reasons and thus has created genuine issues of material facts as to whether Defendant's reasons are worthy of belief. It is not the Court's responsibility, however, to comb through the record and guess which facts Plaintiff believes show that Defendant's non-discriminatory reasons are unworthy of belief.

Nevertheless, as argued by Defendant, regardless of Plaintiff's beliefs relative to management discretion, there is no evidence that such discretion could be exercised under these circumstances so as to allow Plaintiff to open an account without proper identification or enter an inaccurate expiration date into TouchPoint. Indeed, Plaintiff testified that she was never told she could exercise management discretion and open an account without obtaining valid identification, ECF No. 41 at 15, and Nagy testified that Defendant had a "no exception" policy regarding requirements under the USA PATRIOT Act which was clearly set forth in Defendant's policies. Id. at 40-41, 61, 84, 89, 100-103. Nor has Plaintiff pointed to any other employees that violated these policies and were treated more favorably than she was or any evidence that would suggest that the individuals who investigated Plaintiff's violations or participated in the decision to terminate her employment knew of such employees or believed that management discretion

could be exercised with respect to the policies at issue.  In short, Plaintiff has not pointed to any evidence that would call into question the fact that she violated bank policy or that the decision to terminate her employment for doing so were not Defendant's true reasons.

Similarly, neither Plaintiff's length of service nor her achievements while in Defendant's employ have any relevance to the requirements of Defendant's policies and code of conduct, Plaintiff's violation of those policies or Defendant's decision to terminate her employment for those violations.  Even if Defendant's decision was unjust or unwise -- or even outright wrong -- Plaintiff has not pointed to any evidence to show that Defendant's reasons for discharging Plaintiff are unworthy of belief or that Defendant was motivated by a discriminatory animus.

Defendant also argues that Plaintiff is unable to show pretext under the second prong of the Fuentes test or that race or gender were motivating factors, and/or that age was a determinative factor, in the decision to terminate Plaintiff's employment.  Plaintiff may show pretext under this prong if she can establish that Defendant: (1) "previously discriminated against her;" (2) "discriminated against other persons within the [P]laintiff's protected class or within another protected class;" or (3) treated similarly situated individuals outside the protected class more favorably.  Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998), *citing* Fuentes, 32 F.3d at 765.  See Ansell v. Green Acres Contracting Co., 347 F.3d 515, 521 (3d Cir. 2003), *quoting* Fuentes, 32 F.3d at 765 ("[a] plaintiff alleging employment discrimination may challenge the employer's proffered explanation by showing 'that the employer treated other, similarly situated persons out of his protected class more favorably…'").

Plaintiff has not addressed Defendant's arguments relative to the first or second prongs, *i.e.*, the absence of any evidence of prior discrimination against Plaintiff or that Defendant discriminated against other members of Plaintiff's protected classes, and thus has seemingly

conceded that the evidence is lacking in this regard. Indeed, as argued by Defendant, Plaintiff's

only allegations that arguably speak to prior discriminatory acts taken against her or that other

persons within her protected classes were treated less favorably are that Operations Manager

Karen Miller had a history of rating experienced, minority managers lower than less experienced,

non-minority managers; that a white, male branch manager was allowed to bring his children to a

company sponsored trip in 2006 or 2007, while Plaintiff was not permitted to bring her

granddaughter; that Marketing Sales Manager Dawn Monaco, who is white, set Plaintiff's goals

as branch manager too high; that Defendant changed its evaluation system in 2008 or 2009,

which unfairly impacted Plaintiff's standing and that of other African-Americans; and that J.P., a

white male branch manager was merely transferred for performance deficiencies whereas D.W, a

black female branch manager were terminated for deficient performance. See ECF No. 39 at 20-

21.

These alleged occurrences, however, have no relation to Plaintiff's policy violations and

Plaintiff's current failure to address Defendant's arguments relative to these incidents suggests

that there is no evidence that would establish pretext. Indeed, Plaintiff has not identified any

experienced minorities or less experienced non-minorities that Karen Miller treated differently or

offered any evidence with respect to the goals allegedly set by Dawn Monaco. Further,

Plaintiff's assertions that she was not permitted to bring her granddaughter on a company trip

and that the evaluation system was changed involve events that occurred six and four years

respectively before Plaintiff's discharge and are too remote in time to evidence pretext. See

Carver v. D.C.I. Chippewa Clinic, 2006 WL 2927628, at *10 (W.D. Pa. Oct. 12, 2006), citing

Ansell v. Green Acres Contracting Co., 347 F.3d at 524 (finding that "[a] court should ...

consider the passage of time between the other act and the act alleged to be discriminatory.

There is a point at which a prior or subsequent act becomes so remote in time from the alleged discriminatory act at issue, that the former cannot, as a matter of law, be relevant to intent," and holding that four years was too remote).  More importantly, Plaintiff has not pointed to any evidence from which a fact finder could conclude that Plaintiff's age, gender or race, had any bearing on these events.  In addition, there is no evidence regarding who the decision-makers were in the incidents involving J.P. and D.W. and it is undisputed that they were supervised by and/or reported to different management than Plaintiff.  As such, notwithstanding Plaintiff's failure to address these alleged events, they do not provide the basis for finding that Defendant's reasons for terminating Plaintiff's employment were pretext for discrimination.

Further, although Plaintiff has addressed Defendant's argument relative to the third consideration, arguing that the record evidence shows that Defendant treated other employees outside of Plaintiff's protected classes more favorably, her argument is unpersuasive as none of the employees to which Plaintiff points as a comparator were similarly situated.[3]

> To be "similarly situated," the plaintiff must show that "the other employee's acts were of 'comparable seriousness.'" *Anderson v. Haverford College,* 868 F. Supp. 741, 745 (E.D. Pa. 1994) (quoting *Linear v. Safeway Grocery,* 843 F.2d 298, 301 (8th Cir. 1988)). "While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'" *Opsatnik v. Norfolk Southern Corp.,* 335 Fed. Appx. 220, 223 (3d Cir. 2009) (quoting *Holifield v. Reno,* 115 F.3d 1555,

---

[3] For reasons that are not entirely clear, Plaintiff makes reference in her brief to "class of one" employment discrimination plaintiffs and appears to suggest that she is a class of one and therefore need not show that the other employees to which Defendant cites were similarly situated. ECF No. 45 at 17.  The class of one theory typically applies to equal protection claims "where a litigant asserts 'that the litigant itself, and not a particular group, was the subject of discriminatory treatment under a particular law.'" Frederick v. Barbush, 2015 WL 4393339, at 5 (M.D. Pa. July 15, 2015), *quoting* PG Pub. Co. v. Aichele, 705 F.3d 91, 114 (3d Cir. 2013).  In such cases, the United States Court of Appeals for the Third Circuit "requires the litigant to allege 'that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id., *quoting* Marcavage v. Nat'l Park Serv., 666 F.3d 856, 860 (3d Cir. 2012) (internal quotations omitted).  See Flanders v. Dzugan, ___ F. Supp. 3d ___, ___, 2016 WL 110014, at *20 (W.D. Pa. Jan. 11, 2016).  Thus, even under a class of one theory, Plaintiff still must demonstrate that she was treated differently from others similarly situated, particularly as Plaintiff herself has cited to the individuals at issue in her Amended Complaint as being individuals outside her protected classes who were treated more favorably than she was, and has specifically referred to them in her Concise Statement of Material Facts as being similarly situated.  ECF No. 19 ¶ 21; ECF No. 46 ¶¶ 170-174.  Plaintiff therefore is not relieved of having to show that these individuals were similarly situated.

> 1562 (11th Cir.1997)). With regard to workplace discipline, the relevant
> factors to consider in determining whether individuals are "similarly
> situated" may include a "'showing that the two employees dealt with the
> same supervisor, were subject to the same standards, and had engaged in
> similar conduct without such differentiating or mitigating circumstances as
> would distinguish the conduct or their employer's treatment of them.'"
> *McCullers v. Napolitano,* 427 Fed. Appx. 190, 195 (3d Cir. 2011) (quoting
> *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617–18 (7th Cir. 2000)).

Glenn v. Raymour & Flanigan, 832 F. Supp. 2d 539, 548-49 (E.D. Pa. 2011). See Nguyen v. AK

Steel Corp., 735 F. Supp. 2d 346, 362 (W.D. Pa. 2010), *quoting* Pierick v. Indiana Univ.-Perdue

Univ. Indianapolis Athletic Dep't, 510 F.3d 681, 688 (7th Cir. 2007) ("a plaintiff must show that

he is similarly situated with respect to performance, qualifications, and conduct.... Typically this

involves showing that the employees shared the same supervisor, performance standards, and

engaged in similar conduct without such differentiating or mitigating circumstances as would

distinguish their conduct or the employer's treatment of them") (internal quotations omitted).

Plaintiff first compares herself to P.C., a white female Assistant Bank Manager, who was

not terminated after she apparently deposited a "piece of paper clearly marked non-negotiable,"

and authorized a $100.00 withdraw from the same account the next day. ECF No. 19 ¶ 21a; ECF

No. 40 ¶¶ 143-44. The record shows, however, that P.C. was terminated "pending review" and

that she resigned in the interim. ECF No. 41 at 24, 59. Furthermore, P.C. did not hold the same

position as Plaintiff and was not supervised by the same individuals as Plaintiff. While P.C. was

an Assistant Branch Manager, Plaintiff was a Branch Manager and thus expected to serve as a

role model for her subordinates and ensure that they were aware of and adhered to all of

Defendant's policies. ECF No. 40 ¶ 20. And, while Plaintiff was P.C.'s immediate supervisor,

Defendant has represented, without objection from Plaintiff, that the Regional Manager in 2005,

at the time P.C. was disciplined, was Alena Leggett ("Leggett"). Plaintiff's immediate

supervisor at the time of her discharge, however, was Regional Manager Smichnick. Id. ¶¶ 26,

28; ECF No. 39 at 24. Moreover, Plaintiff has not pointed to any evidence showing that depositing a paper marked non-negotiable was considered as severe an infraction as failing to comply with identification procedures mandated under the USA PATRIOT Act and/or entering false information into TouchPoint to generate an account. Nor has Plaintiff pointed to any evidence that the same decision-makers were involved in the two disciplinary decisions. Moreover, it appears that the Final Written Warning that P.C. received was signed by Plaintiff. ECF No. 41 at 57.

Similarly, Plaintiff compares herself to M.S., a younger white female, who was only given a warning after signing a customer's name on a supporting loan document. ECF No. 19 ¶ 21b. M.S. was also Plaintiff's subordinate and the Regional Manager at the time was Leggett, not Smichnick. ECF No. 41 at 24. In addition, M.S. did not open an account by entering false information into TouchPoint and there is no evidence that the same decision-makers that were involved in the decision to give M.S. a warning were involved in the decision to discharge Plaintiff.

Plaintiff also compares herself to J.K., a younger white male; J.W., a younger white female; and R.L., a younger whiter male, all of whom were Plaintiff's subordinates holding positions of teller manager, senior teller and senior banker, respectively. ECF No. 19 ¶¶ 21c-e. All three apparently falsified their time cards in October of 2009, but were not fired. ECF No. 41 at 18, 26, 60-64. In addition, J.K. was accused of using vulgar language and being disrespectful and insubordinate to management; J.W. allegedly had difficulties dealing with a diverse customer base and was resistant to coaching and counseling; and R.L. had a number of deficiencies including lying and stealing. ECF No. 41 at 25-27. None of these infractions, however, involve accepting an invalid driver's license to open an account, entering false

information regarding the expiration date into the computer, or the violation of any other policy relative to the USA PATRIOT Act and thus are not comparable to Plaintiff's policy violations. ECF No. 41 at 25. Furthermore, these incidents took place over three years prior to Plaintiff's termination and when Plaintiff reported J.K., J.W., and R.L.'s infractions, Sheryl Legato was the Regional Manager, not Smichnick. Thus, there is no evidence that anyone who made the decisions regarding potential disciplinary action against J.K., J.W. or R.L. were involved in the decision to terminate Plaintiff's employment. Id. at 18, 25, 60-64; ECF No. 40 ¶ 28. Conversely, there is no evidence that Walters, Smichnick or Nagy had any input into what discipline J.K., J.W. or R.L. should receive.

Under these circumstances, no reasonable fact finder could conclude that P.C., M.S., J.K., J.W., or R.L. were similarly situated to Plaintiff or are proper comparators for establishing that Plaintiff was treated more harshly than employees outside of Plaintiff's protected classes.[4] Indeed, Plaintiff seemingly concedes as much having responded to Defendant's arguments stating only that these employees held responsible positions and that there was a culture of white employees engaging in wrongdoing without the same repercussions. ECF No. 45 at 18-19. Moreover, Plaintiff has admitted that the Regional Managers, and presumably the decision-makers, at the time these employees violated company policies were different from the Regional Manager at the time that Plaintiff was discharged. Id.

Finally, to support her claim of race discrimination, Plaintiff points to G.P., an older white female who was investigated for a possible violation of the Bank Secrecy Act as amended

---

[4] Moreover, Plaintiff's argument that Defendant has changed its position regarding proper comparators is misplaced. ECF No. 45 at 17-18. Defendant's present argument is that P.C., M.S., J.K., J.W. and R.L. were not similarly situated, in part, because they were not Branch Managers and thus held a different position than Plaintiff. Although Defendant identified other employees who were not Branch Managers in its Concise Statement of Material Facts and its position statement submitted to the EEOC, it did so simply to show that Defendant had terminated other employees in Plaintiff's protected classes who had committed similar violations of policy as Plaintiff and not to show they were similarly situated to Plaintiff. See ECF No. 40 ¶¶ 119-123; ECF No. 49-6 at 2. Defendant's positions therefore are entirely consistent.

by the USA PATRIOT Act. ECF No. 45 at 10-15. Specifically, G.P. was investigated for "structuring," or splitting deposits so as to avoid having to fill out a Currency Transaction Report, as is required under the Bank Secrecy Act for transactions in excess of $10,000.00. G.P. apparently deposited $10,000.00 in cash into her personal account on March 25, 2013, $10,000.00 on March 27, 2013, and $4,400.00 on April 3, 2013, which were identified by Defendant's AML Application as potential structuring. Id. at 10. See ECF No. 40 ¶¶ 124-129. Plaintiff argues that because G.P. was also a Branch Manager within the Pittsburgh South Region, was supervised by Smichnick at the time, and also investigated for violating the USA PATRIOT Act, the fact that G.P. was given only a verbal warning evidences that Plaintiff's termination was motivated by a discriminatory animus. The Court disagrees.

While the similarities cited by Plaintiff are undisputed, the differences between the two incidents far outweigh the similarities such that a fact finder could not reasonably conclude that G.P. was similarly situated to Plaintiff or that Defendant's reasons for terminating Plaintiff were pretext for discrimination. Indeed, G.P. was investigated for *possible* structuring in violation of Defendant's AML policies while Plaintiff was investigated for accepting an invalid ID and entering a false expiration date into the computer thereby violating Defendant's Customer Identification Procedures specifically designed to comply with the USA PATRIOT Act. More importantly, however, G.P. not only denied structuring but provided an explanation for the three deposits, which those investigating the incident found credible, whereas Plaintiff admitted during the investigation and at her deposition that she had accepted an expired driver's license as identification to open Mr. S.'s account and entered false information into TouchPoint. ECF No. 40 ¶¶ 65, 80, 132-134. Thus, contrary to Plaintiff's assertion, Defendant did not "disbelieve

Plaintiff," but accepted her admission and proceeded accordingly.[5]  Further, Plaintiff admitted to opening other accounts without valid identification in violation of policy and admitted to opening Mr. B.'s account without him being present, while GP had no other suspicious transactions.  Id. ¶¶ 80, 135; ECF No. 41 at 33.  In addition, although Plaintiff makes much of the fact that Hanna of CSS, who was assigned to investigate Plaintiff's case, participated in an interview of G.P., the record shows that G.P.'s case was assigned to Jeff Bauer to investigate.  ECF No. 40 ¶¶ 131, 132.  Moreover, after CSS's initial investigations of the facts were completed, both cases were forwarded to Employee Relations Service Center for review and assigned to different consultants for disciplinary recommendations.  As previously discussed, Plaintiff's case was assigned to Walters who made the recommendation that Plaintiff's employment be terminated; G.P.'s case, however, was assigned to Courtney Concannon ("Concannon") who, finding that G.P. was being truthful about her deposits and was not structuring, recommended that G.P. be given verbal coaching.  ECF No. 40 ¶¶ 136-138, 140.  While Concannon apparently spoke with Smichnick about the incident, they both testified that it was Concannon that made the recommendation and that Smichnick merely agreed.  Id. ¶¶ 139-141.  Thus, not only was G.P., unlike Plaintiff, absolved of any wrong-doing but the decision-makers in their respective cases were not the same.  Under these circumstances, no reasonable fact finder could conclude that G.P. was similarly situated to Plaintiff and the decision to give her verbal coaching cannot provide the basis for finding that Defendant's reasons for terminating

---

[5] Further, Plaintiff's argument that G.P. is somehow similarly situated to Plaintiff because a jury could reasonably conclude that G.P. lied about the circumstances surrounding her deposits is irrelevant.  The question before the Court is whether Plaintiff is able to prove that Defendant's reasons for terminating her employment were pretext for discrimination by showing that other similarly situated employees were treated more favorably.  Even if G.P. had been untruthful, it does not negate the evidence that she was not similarly situated to Plaintiff or that Defendant determined, rightfully or wrongfully, that she did not violate Defendant's policies.  See Keller v. Orix Credit Alliance, Inc., 130 F.3d at 1108-1109, quoting Fuentes , 32 F.3d at 765 (it is not sufficient for a plaintiff to "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is . . . not whether the employer is wise, shrewd, prudent, or competent").  As such, G.P.'s credibility, or lack thereof, does not show that Defendant's decision to terminate Plaintiff's employment was based on a discriminatory animus.

Plaintiff were pretext for discrimination. Indeed, in this Court's view, the record before the Court is completely devoid of any evidence that Defendant had a discriminatory animus toward Plaintiff or that its employment decision was in anyway motivated by Plaintiff's age, gender or race. The fact that Plaintiff is a member of these protected classes and was terminated from her employment is simply insufficient to carry her burden of production or her ultimate burden of persuasion.

### D.    CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendant's Motion for Summary Judgment, ECF No. 37, be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

RESPECTFULLY SUBMITTED,


/s/ Maureen P. Kelly
MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE


Dated: May 24, 2015


cc:    The Honorable David Stewart Cercone
       United States District Judge

       All counsel of record by Notice of Electronic Filing